**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA      :

    v.                         :          NO. 20-CR-210

MICHAEL "OZZIE" MYERS"     :

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States of America, by its attorneys, Jennifer Arbittier Williams, United States Attorney for the Eastern District of Pennsylvania, and Eric L. Gibson and Richard P. Barrett, Assistant United States Attorneys for the District, respectfully submits this memorandum to address anticipated evidentiary issues at trial.

## I.    INTRODUCTION

The facts that the government expects to prove at trial are set forth in detail in the Superseding Indictment and in the government's responses to the motions to dismiss counts in the Superseding Indictment.   The government expects the evidence at trial to prove beyond a reasonable doubt that the defendant Michael "Ozzie" Myers organized and directed years' long ballot stuffing schemes in south Philadelphia's 39th Ward, 36th Division and the 39th Ward, 2nd Division.

## II.    FACTUAL BACKGROUND

Myers, a former member of the U.S. House of Representatives from Pennsylvania's First District, hired himself out as a "political consultant."   As a "consultant," Myers held himself out as an effective and successful political operative

1

capable of ensuring his clients' electoral success.   Myers' criminal efforts were generally, although not exclusively, directed at securing election victories for local judicial candidates running for Philadelphia's Court of Common Pleas or Municipal Court who had employed Myers as a "political consultant."   Myers also exercised influence and control in Philadelphia's 39th Ward by distributing cash payments to various election officials and supporting family, friends, and allies for elective office in the 39th Ward.   Myers installed Ward Leaders, Judges of Elections, and Democratic State Committee Persons in south Philadelphia Wards.

With respect to the relevant elections, the following positions constituted the Election Board in each of Philadelphia's polling stations:

> • **Judge of Election.**   The Judge of Elections is elected to office or appointed by Court of Common Pleas.   The Judge of Election is responsible for overseeing the entire election process and voter activities for his or her Division. Each Judge is charged with conducting the Division's polling place in accordance with Federal and State election laws.   If the duly elected or appointed Judge of Election fails to appear at the polling station by 7:00 a.m. on Election Day, the Majority Inspector appoints a Judge of Election.

> • **Majority Inspector**.   The Majority Inspector is elected to office or appointed by Court of Common Pleas.   If the duly elected or appointed Majority Inspector fails to appear at the polling station by 7:00 a.m. on Election Day, the Judge of Election appoints a Majority Inspector.

> • **Minority Inspector.**   The Minority Inspector is elected to office or appointed by Court of Common Pleas.   If the duly elected or appointed Minority Inspector fails to appear at the polling station by 7:00 a.m. on Election Day, the defeated candidate for Judge at the last election in which officers were voted upon shall serve, if available. In actual practice, Domenick DeMuro would enlist a family member to serve as the Minority Inspector in the 39th Ward, 36th Division.

> • **Clerk.**   The Clerk is appointed by Minority Inspector

• **Machine Inspector.**   The Machine Inspector is appointed by Philadelphia's City Commissioners.

The Majority Inspector, Minority Inspector, and Clerk assist the Judge of Election in overseeing the election process at a particular polling place. They receive assignments from the Judge of Election and help enforce voting regulations and procedures.   The Machine Inspector sets up the voting machines and instructs voters in the use of the voting system.

The members of the Board of Elections are paid by the City of Philadelphia per election. Each member of the Board of Elections is charged with overseeing the Division's polling place in accordance with Federal and State election laws.   The Board members are supposed to attend Election Board Training conducted by the Philadelphia City Commissioners.   They are also compensated a modest sum for attending the training.

## VOTING PROCEDURES

### Overview of Procedures On Election Day

At all times relevant to the Superseding Indictment, the procedures to be followed by the members of the Board of Elections on Election Day were as follows:

1. Meet all Election Board Officials at the polling place between 6:00 AM and 6:30 AM. If all members are not present, contact the missing Officials immediately.

2. Once assembled, all Election Board Officials must be sworn in by the Judge. The Judge is sworn in FIRST by the Minority Inspector. The printed Oath of Office is inside the Election Materials Box. Immediately after being sworn in, all Election Board members sign the Oath of Office.

3. Prepare the polling place for 7:00 AM opening.

4. Appoint Election Board Officials to specific duties.

5. Open the polling place at 7:00 AM.

3

6.      Throughout Election Day:

     a.      Enforce voting regulations and procedures.
     b.      Assign relief periods for the Board Members and fill vacancies as required.

7.      Close the polling place at 8:00 PM.

Each polling station, including the 36th and 2nd Divisions of the 39th Ward maintained a polling book that documents the name, party affiliation, and order of appearance of each voter who appears at the polling station to cast his or her ballot in the election.   The polling books are maintained as official records by the Philadelphia City Commissioners.

The Voting Machines at each polling station generated records in the form of a printed receipt ("Results Receipt") documenting the use of the Voting Machine which contain:   a.) the Opening Zero Count; b.) the Election board Officials' Opening Certification signatures; c.) any Write-in Votes, and d.) Vote Totals.   Among the Vote Totals is a category called "Public Count."   This category reflects the number of ballots cast in the machine and corresponds or should correspond with the number of voters who physically appeared at the polls.   For example, a ballot could contain a variety of elective offices and the voter would cast a vote for specific offices on a single ballot.   If 158 voters appeared at the polling station to vote, and the polling station had a single machine at its disposal, the Public Count on the machine receipt should be "158."   The number recorded as the "Public Count" by the machine should correspond directly with the number of voters signing the poll book at the polling station on Election Day.   In this example, if 158 voters are documented in the Results Receipt on the machine, 158 voters should sign the poll book.   The Judge of Elections and the Election Board

Officials at each polling place are required to attest to the accuracy of machine results by affixing their signatures to the last page of the Results Receipt.

After the polls close, the Results Receipt from the Voting Machine, which documents the ballots cast in an election, is placed in a vinyl cartridge-Results Bag, generally for pickup by a Philadelphia Police Officer after the close of the polls.   At the end of Election Day, the Cartridge-Results Bag contains a.) paper Results Receipt; b.) the memory cartridge from each Voting Machine; and, c.) Absentee Voter Lists.   These official election records are transported to the office of the Philadelphia City Commissioners at Riverview Place, Delaware Avenue and Spring Garden Streets in Philadelphia or one of various tabulation centers maintained by the City Commissioners in locations throughout the city.

At trial, the evidence will largely consists of: 1) the poll books for the 39th Ward, 36th Division; 2) the machine Results Receipts for the two voting machines in use at the 39th Ward, 36th Division; 3) the accounts of the DeMuros; 4) toll records for Myers' cellular telephone; 5) Campaign Finance Reports (CFRs) for Myers' candidates; and 5) recordings made by Domenick DeMuro of his conversations with Myers heading into the 2016 general election and the 2017 election cycle.

When confronted by the FBI at his home on October 19, 2016, DeMuro admitted to adding fraudulent ballots and votes to the voting machine totals in each election cycle since at least 2011.   Similarly, DeMuro's spouse confessed to adding 10 – 12 ballots for the three previous election cycles.

**Myers' Consulting Business**

The evidence at trial is expected to demonstrate that Myers regularly solicited monetary payments as consulting fees from candidates for elective office.   A significant portion of his clients were candidates for judgeships in Philadelphia's Court of Common Pleas or Municipal Court.   The judicial elections were often decided by a handful of votes recorded for the winning candidate on Election Day.   Moreover, the ultimate outcomes of the judicial races were almost always determined on Primary Election Day in the Spring since the Democratic Party enjoyed a nearly 5-1 registration advantage over the Republican Party in Philadelphia.   Thus, the winners of the Democratic primary who advanced to the general election had a virtual lock on winning office.   The evidence will show that the payments from the candidates to Myers took the form of cash or checks, sometimes blank checks signed purportedly by a representative of the candidates' campaigns.

In the 39th Ward, after receiving the money, Myers would then take portions of these funds and make payments to Election Board Officials, including defendant Domenick DeMuro in the 39th Ward, 36th Division.   These payments from Myers could take the form of checks or, more frequently, cash.   In return, DeMuro and other Election Board officials tampered with the election results in support of Myers' clients.

In the 39th Ward, Myers would also provide DeMuro with cash to distribute to Election Officials in other Divisions of the 39th Ward, including the 25th, 41st, and 44th Divisions. DeMuro will testify that after he received payments from Myers ranging from between $300 to $5,000 per election, he would "ring up" votes for Myers' preferred candidates by fraudulently and surreptitiously manipulating the vote totals on the Voting Machines in the 39th Ward, 36th

Division. This increased the number of votes recorded for Myers' clients, thereby diluting and distorting the ballots cast by actual voters.

In the run up to Election Day, Myers would relay instructions to his associates, including DeMuro and Marie Beren, via cellular telephones capable of interstate transmissions regarding which candidates DeMuro should "ring up" or add fraudulent votes for during Election Day in the 39th Ward.

### 39th Ward, 36th Division

After the polls closed on Election Day, DeMuro was required to certify the Voting Machine results from the 39th Ward, 36th Division, by attesting to the accuracy of the paper results receipt placed in the Cartridge-Results Bag with the memory cartridge from each Voting Machine for delivery to the City Commissioners.   On some occasions, he and his Board certified the results while on others they appear to have turned in the machine receipts without the required signatures.   In any event, DeMuro's attestations were false and the Machine Receipts reflected the false vote totals because they included the fraudulently added votes cast by DeMuro and his family members.

### 2014 Primary[1]

On May 20, 2014, DeMuro and/or his family added 27 fraudulent ballots during the primary election in the 39th Ward, 36th Division, on behalf of Myers' preferred candidates running for judicial office in the First Judicial District of Pennsylvania.   In other words, according to the numbers documented in the machine results, 118 voters exercised the franchise on Primary Election Day.   The Results Receipts from the voting machines document 118 ballots

---

[1] The ballot for this primary election included candidates for a federal elected office.

cast during the primary election in the 39th Ward, 36th Division, even though only 91 voters physically appeared at the polling station to cast ballots.   Those 91 voters who actually appeared had to sign the polling book.

After the polls closed, DeMuro turned in to the office of the Philadelphia City Commissioners the Results Receipts from voting Machine # 021873 and Machine # 021874 documenting 118 ballots cast during the primary election in the 39th Ward, 36th Division, even though only 91 voters physically appeared at the polling station to cast ballots as reflected in the polling book.

### 2015 Primary[2]

DeMuro is expected to testify that in May of 2015, Myers gave him approximately $1000 in cash in exchange for defendant DeMuro adding fraudulent votes during the primary election in the 39th Ward, 36th Division, on behalf of Judicial Candidate # 1 who was running for Judge of the Court of Common Pleas in the First Judicial District of Pennsylvania.   Judicial Candidate # 1's CFRs for the relevant time show that the campaign made three payments to Myers in the amounts of $5,000, $5,000, and $10,000 in May of 2015.[3]

DeMuro is expected to testify that in May of 2015, defendant Myers also gave him approximately $500 in exchange for DeMuro adding fraudulent votes during the primary election in the 39th Ward 36th Division on behalf of Judicial Candidate # 2,[4] also running for Judge of the Court of Common Pleas in the First Judicial District of Pennsylvania.

---

2 The ballot for this primary election did not include a candidate for federal elective office.

3 Judicial Candidate # 1 is expected to acknowledge at trial that Myers was paid as a consultant during the campaign, but will testify that Myers did not disclose anything to the candidate about fraudulent voting.   Judicial Candidate # 1 won a seat on the Court of Common Pleas.

4 Judicial Candidate # 2 is expected to testify that the candidate did not recall giving Myers money during the campaign.   Despite the efforts of Myers and DeMuro, Judicial Candidate # 2 did not prevail in the 2015 election

DeMuro is further expected to testify that in May of 2015, defendant Myers gave him approximately $1000 in exchange for DeMuro adding fraudulent votes during the primary election in the 39th Ward, 36th Division, on behalf of Judicial Candidate # 3 running for Judge of the Court of Common Pleas in the First Judicial District of Pennsylvania.   Judicial Candidate # 3's CFRs for the relevant time show that the candidate's campaign made two payments to Myers, both for $5,000, during the 2015 election cycle.[5]

During this election cycle, however, DeMuro will testify that Myers was pushing additional candidates, including candidates for mayor of Philadelphia and justice of the Pennsylvania Supreme Court.[6]   According to DeMuro, Myers made it clear that DeMuro was to ensure Myers' preferred candidates for mayor and state supreme court justice won (and both did).   In total, DeMuro received approximately $6,500 from Myers for the 2015 primary which was the most money Myers ever paid DeMuro to "ring up" votes.   Neither the mayoral candidate nor the candidate for state supreme court reported hiring Myers as a consultant.

On May 19, 2015, DeMuro and/or his family added 40 fraudulent ballots during the primary election in the 39th Ward, 36th Division, on behalf of Myers' preferred candidates running for judicial office in the First Judicial District of Pennsylvania.

Toll records for Myers' cellular telephone will be introduced to show that on Primary Election Day 2015, Myers called DeMuro fourteen times, including immediately before the polls

cycle.   Judicial Candidate # 2 ran again in 2017, and is now on the Municipal Court bench.
5 If Judicial Candidate # 3 testifies at trial, the former candidate is expected to acknowledge that the campaign paid Myers during the race, but will testify that Myers did not disclose anything to the candidate about fraudulent voting. Judicial Candidate # 3 won, and is now a judge on the Court of Common Pleas.
6 The candidate for Pennsylvania Supreme Court was related to a Philadelphia labor leader.   The union led by the candidate's family member hired defendant Myers as a political consultant.

opened and shortly after the polls closed.    The pair spoke for approximately 49 minutes over the course of those 14 calls.    According to DeMuro, they discussed Myers' clients and the election.

After the polls closed, DeMuro and his Election Board turned in to the office of the Philadelphia City Commissioners the Results Receipts from voting Machine # 021873 and Machine # 021874.   The Results Receipts from the machines documented 259 ballots cast during the primary election in the 39th Ward, 36th Division, even though only 219 voters physically appeared at the polling station to cast ballots, as reflected in the polling book.

### 2016 Primary[7]

The evidence at trial is expected to show that defendant Myers received payments from a local union's super PAC, the Committee on Political Education ("COPE").    COPE reported $40,000 in payments to Myers during 2016.   According to DeMuro, the union in 2016 was supporting the incumbent for the U.S. House of Representatives for Pennsylvania's First Congressional District, a candidate for Pennsylvania Attorney General and a candidate for Pennsylvania State Senate for the First District.    DeMuro is expected to testify that these are the candidates which DeMuro received payments from Myers to "ring up votes" on the 2016 primary ballot.   On April 26, 2016, DeMuro and/or his family added 46 fraudulent ballots during the primary election in the 39th Ward, 36th Division, on behalf of Myers' preferred candidates.

After the polls closed, DeMuro and his Election Board turned in to the office of the Philadelphia City Commissioners the Results Receipts from voting Machine # 021873 and Machine # 021874.   The Results Receipts documented 266 ballots cast during the primary

---

7 The ballot for this primary election included various candidates for federal office.

election in the 39th Ward, 36th Division, even though only 220 voters physically appeared at the polling station to cast ballots as reflected in the polling book.

**39th Ward, 2nd Division**

Defendant Myers also conspired with Marie Beren, formerly the Judge of Elections for the 39th Ward, 2nd Division, to deprive persons of civil rights, falsification of records, voting more than once in federal elections, and conspiring to do so, by scheming from at least 2015 through May of 2019 to fraudulently and surreptitiously manipulate the vote totals on the Voting Machines in Philadelphia's 39th Ward, 2nd Division, to increase the number of votes recorded for certain candidates, thereby diluting and distorting the ballots cast by actual voters.

The evidence at trial is expected to show that in approximately 1988, defendant Myers recruited Marie Beren to serve as a Judge of Elections for Philadelphia's 39th Ward, 2nd Division. Approximately four years prior, Myers had recruited and installed Beren as a Committee Person for the Democratic Party in the 39th Ward in the City of Philadelphia.

Records and witness accounts at trial will establish that Marie Beren formally served as the Judge of Elections for Philadelphia's 39th Ward, 2nd Division from 1988 through 2015. Beginning in approximately 2010, the polling location for the 39th Ward, 2nd Division moved to the Seafarer's Union Hall located at 4th and Shunk Streets in Philadelphia, Pennsylvania. The Seafarer's Union Hall was also the polling location for the 39th Ward, 11th Division and the 39th Ward, 16th Division. The evidence at trial is expected to show that Beren became the de facto Judge of Elections for all three divisions. Beren is expected to testify that the move to the Seafarer's Union Hall diminished turnout in her division because the voters were reluctant to

walk through the neighborhood in which it was located in order to vote.   This resulted in some increased pressure to produce votes in the 39th Ward, 2nd Division.

Following the 2015 Primary Election, Marie Beren appeared to "step down" from her formal role as Judge of Elections for the 39th Ward, 2nd Division.   Beren, who also worked in constituent services for a city councilman at the time, is expected to testify that beginning in 2015, Philadelphia would no longer pay her as an election official because she held another city job.   From that point on, Beren became a certified poll watcher, and she installed a close associate – her granddaughter or another trusted subordinate   - to "serve" as the new Judge of Elections.   In her capacity as a "poll watcher," Beren maintained access to the polling locations at Seafarer's Union Hall for Philadelphia's 39th Ward, 2nd Division, the 39th Ward, 11th Division, and the 39th Ward, 16th Division.   Although election records for the 39th Ward, 2nd Division frequently identified her granddaughter, or occasionally other associates, serving as Judge of Elections, according to witnesses, in reality Beren continued to effectively run all three Divisions located at the Seafarer's Union Hall from 2015 through at least 2019.   Beren also recruited and installed the other Election Board Officials for the 39th Ward, 2nd Division.

While Marie Beren effectively ran the polling places for Philadelphia's 39th Ward, 2nd Division, the 39th Ward, 11th Division, and the 39th Ward, 16th Division, defendant Myers gave Beren directions to add votes to candidates supported by him, including candidates for judicial office whose campaigns actually hired Myers, and other candidates for various federal, state, and local elective offices preferred by Myers for a variety of reasons.

Beren is expected to testify that on almost every Election Day, Myers transported her to the polling station to open up the polls.   During the drive to the polling station, Myers would

advise Beren which candidates he was supporting so that Beren knew which candidates should be receiving fraudulent votes.

While the polls were open, Marie Beren would advise actual in-person voters to support Myers' candidates and also cast fraudulent votes in support of Myers' preferred candidates on behalf of voters she knew would not or did not physically appear at the polls.   She would have the other election officials that she had recruited assist her in this endeavor.

During Election Day itself, Myers – as he did with Domenick DeMuro in the 39th Ward, 36th Division - would confer with Beren via cellular telephone while she was at the polling station about the number of votes cast for his preferred candidates.   Beren would report to Myers how many "legit votes," meaning actual voters, had reported and cast ballots.   If actual voter turnout was high, Beren would add fewer fraudulent votes in support of Myers' preferred candidates.   From time to time, Myers would instruct Beren to shift her efforts from one of his preferred candidates to another.   Specifically, Myers would instruct Beren "to throw support" behind another candidate during Election Day if he concluded that his first choice was comfortably ahead.

Marie Beren would also repeatedly permit individual voters from the 39th Ward, 2nd Division to cast ballots on behalf of absent friends and family members who had not appeared at the polling station in person.   In those instances, Beren would use her influence to steer her friends and neighbors towards casting ballots for their absent family members in support of candidates supported by Myers.

Marie Beren and the individuals she recruited to serve as Election Board Officials would falsify the polling books and the List of Voters and Party Enrollment for the 39th Ward, 2nd

Division, by recording the names, party affiliation, and order of appearances for voters who had not physically appeared at the polling station to cast his or her ballot in the election.   Beren and others working the elections would then cast fraudulent ballots purportedly on behalf of these eligible voters who had not, in fact, appeared in person to cast ballots themselves.   Unlike with DeMuro, Beren and her subordinates took pains to ensure that the number of ballots cast on the machines was a reflection of the number of voters signed into the polling books and the List of Voters.

After the polls closed on Election Day, Marie Beren and her recruits would certify the Voting Machine results from the 39th Ward, 2nd Division, by attesting to the accuracy of the paper results receipt placed in the Cartridge-Results Bag with the memory cartridge from each Voting Machine for delivery to the City Commissioners.   Occasionally, the election officials would leave the certification blank.

At trial, in addition to Beren's testimony, the government will produce the poll books and Lists of Voters and Party Enrollment for the 39th Ward, 2nd Division, the machine Results Receipts for the voting machines in use at the 39th Ward 2nd Division, toll records for Myers' cellular telephone showing his contacts with Beren during Election Day, Campaign Finance Reports (CFRs) for Myers' client candidates, and the testimony of eyewitnesses, including eligible, registered voters who were signed into the poll books and who appear on the lists of voters even though they did not, in fact, cast ballots.

### Myers' Intent Captured on Consensual Recording

The proof at trial will establish beyond a reasonable doubt that Myers acted with the intent to hide his schemes and obstruct justice and federal law enforcement.   In particular, the

evidence will prove that Myers:   a.) instructed DeMuro not to discuss the "ballot stuffing" over the telephone; b.) advised DeMuro to conceal the receipt of bribes by providing fictitious names to be listed as the payee on checks drawn on the campaign accounts of defendant Myers' preferred candidates and unwitting clients by telling DeMuro, "I'm gonna get you a couple checks there's no question about that. If you want to give me a - a different name than Domenick DeMuro that's your business…;" c.) advised DeMuro that defendant Myers would hand DeMuro bribe payments in the form of checks after the deadline for the last campaign finance report prior to the May 2017 primary election because, "you don't wanna - you don't wanna be on any [candidate's campaign finance] report May 7th when the election is May 16th;" d.) had DeMuro sign receipts for bribe payments in the form of cash and instructing DeMuro that "if there was ever a question Dom . . . you know you'd say well I gave the money out Election Day [to get out the vote];" and, e.) provided a check to DeMuro drawn on the campaign account of defendant Myers' client candidate and made payable to DeMuro's spouse and later falsely characterized on the unwitting candidate's campaign finance report as supporting a "get out the vote" effort.

The very content of the communications and instructions from Myers, a former United States Congressman tampering with multiple federal elections, shows that he clearly anticipated that the scheme might draw the attention of federal investigators.   The government's evidence at trial will establish that he specifically told DeMuro not to discuss the ballot stuffing scheme over the telephone, obviously concerned that federal law enforcement might be listening in to their conversations (a well-founded fear).   Additionally, the creation of misleading and phony receipts to paper over and justify the bribe payments in cash, the fictitious payee names for bribes in the form of checks, the intentional delay of reporting the bribe payments drawn on

candidates' campaign accounts on campaign finance reports until after the elections, and the explicit instructions to attribute the bribe payments "to get out the vote" efforts if and when DeMuro was confronted about the scheme, all demonstrate concealment and consciousness of guilt.

## III.   POTENTIAL LEGAL ISSUES

### A.   Stipulations

The government and the defendant have agreed to several stipulations, which hopefully will streamline the presentation of evidence during the trial. In particular, the parties have agreed to stipulate as to the authenticity – but not admissibility – of business records, bank records, public records, and toll records that might be offered into evidence.

### B.   Defendant Myers Cannot Elicit or Present His Own Statements

At trial, the government will present consensually recorded conversations between defendant Myers and cooperating witness Domenick DeMuro.   The government will also introduce statements the defendant made to testifying witnesses.   The statements of the defendant are admissible by the government as admissions of a party opponent under F.R.E. 801(d)(2).

The defendant, however, cannot elicit or admit his own prior statements, because they are hearsay; if offered by the defendant, they are not admissions of a party opponent.   The defendant cannot present any exculpatory statements he made by playing recordings of the conversations that were made by DeMuro, by questioning witnesses called by the government on cross-examination, or by any means other than through his own testimony.   *See United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986) (affirming district court's ruling that tape recording of a

conversation between a codefendant and government informant that defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)).   *See also United States v. McDaniel,* 398 F.3d 540, 545 (6th Cir. 2005) (emphasis in original) ("Rule 802(d)(2) [ ... ] does not extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses" . . . to hold otherwise would allow defendant to do "an end run around the adversarial process by, in effect, testifying without swearing an oath, facing cross examination, or being subjected to first hand scrutiny by the jury").

In *McDaniel*, the Sixth Circuit upheld the district court's decision to preclude defense counsel from eliciting statements the defendant made to a postal inspector who testified at trial. *Id*.   Although the inspector testified on direct examination for the government about statements the defendant made to her, the defendant could not question the inspector about other things the defendant said to the inspector, because Rule 801(d)(2) does not permit a defendant to introduce his or her own out-of-court statements. *Id*. at 544.

Defendant Myers cannot make an end-run around these hearsay rules by citing the Rule of Completeness. For example, many of the recordings that the government will present at trial have been redacted.   Portions of the conversations that are unrelated to the subjects discussed in the portions that will be played have been redacted to make the presentation of the government's case more efficient, and not confuse the jury.   In those instances, the defendant cannot introduce the redacted portions of the conversations by citing the Rule of Completeness, as set forth in Federal Rule of Evidence 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of

any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008). In *Hoffecker,* the Third Circuit upheld, under Rule 801(d)(2), the exclusion of portions of an audiotape in which the defendant made exculpatory statements, even though the government had played a portion of the recording in its case-in-chief. The Court found that the Rule of Completeness did not compel a different result. *Id.* at 192.

This principle applies to both recorded conversations as well as witness testimony that contains statements of the defendants; even if only a portion of the conversation or statement is played or presented by the government, the defendant may not present his statements that were not introduced unless he testifies. *See United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) ("Rule 106 does not ... render admissible the evidence which is otherwise inadmissible under the hearsay rules, [n]or does it require the admission of self serving, exculpatory statements made by a party which are being sought for admission by that same party") (internal quotations and citations omitted); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); *United States v. Rivera*, 61 F.3d 131, 136 (2d Cir. 1995) ("Rule 106 does not render admissible evidence that is otherwise inadmissible"); *United States v. Mahaffy*, 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) ("A court may ... exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay") (internal quotations omitted).

Similarly, in *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000), the court affirmed the district court's decision precluding the defendant from eliciting his own exculpatory statements on cross-examination of a law enforcement officer, holding that the defendant's statements were inadmissible hearsay.   *Id*. at 682.   The court recognized that any other ruling would have allowed the defendant to put his own statements before the jury without having to take the stand himself – the precise situation the hearsay rule forbids.   *Id*. at 682.   In reaching its decision, the *Ortega* court distinguished the defendant's attempt to elicit his own exculpatory statements from the government's use of the defendant's inculpatory statements, noting that only the latter constitute "admissions by a party opponent and . . . therefore not hearsay," and noted that the Rule of Completeness did not apply.   *Id*. at 681-682.

The Third Circuit in *Hoffecker* identified a narrowly-drawn exception to the general rule that the defendant may not present his statements that were not introduced unless he testifies.   In that case, the Third Circuit noted that additional portions of a recording may be played "if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) ensure a fair and impartial understanding."   *Hoffecker*, 530 F.3d at 192 (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir.1984) (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982)).   The Third Circuit cautioned that "[t]he Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted."   *Id. See Marin*, 669 F.2d at 84; *United States v. Bailey*, 322 F. Supp. 3d 661, 675 (D. Md. 2017) ("Neither Rule 106 nor the common-law rule of completeness is triggered unless some clearly identifiably unfairness would exist without

allowing the party that would be prejudiced the opportunity to offer information that would clarify or explain").

That an omitted portion of a conversation merely deals with the same subject matter as a published portion is not enough.   In *Hoffecker*, the Court rejected a Rule 106 claim where the defendant sought to admit his statements from one conversation in order to explain his statements during another conversation, where the prior statements were not necessary to avoid misleading the jury or to ensure a fair and impartial understanding.   530 F.3d at 192.   If the defendant seeks to introduce any of his prior statements under Rule 106, Myers must specify the particular passages that he believes are necessary for purposes of Rule 106 completeness and, for each passage, set forth why the admission of the prior statements are necessary to avoid misleading the jury or to ensure a fair and impartial understanding.   *United States v. Price*, 516 F.3d 597, 604-05 (7th Cir. 2008) (As the party seeking to admit the additional evidence, [the defendant] must establish both that the evidence is relevant to the issues in the case and that it clarifies or explains the portion offered by the Government).

**C.     Rule 608(b) Precludes the Defendant from Attacking the Character of Government Witnesses in Matters Unrelated to Veracity.**

Should Myers attempt to pursue cross-examination that is designed to unfairly attack the character of one or more of the government's trial witnesses in matters that are not related to veracity or otherwise attempt to introduce extrinsic evidence designed to accomplish those objectives, the government will interpose appropriate objections and will ask the Court to preclude such efforts based on the authorities set forth below.

Federal Rule of Evidence 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning his character for truthfulness or untruthfulness. . . .

Weinstein states: "Rule 608(b) is intended to be restrictive. . . . The rule does not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness." Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 608.22[2][c] [i] (2d ed. 1997). *See also United States v. Davis*, 183 F.3d 231, 257, *amended*, 197 F.3d 662 (3d Cir. 1999) (holding that cross-examination of witness on perpetration of a prior assault was governed by Rule 608(b), not Rule 404(b), and was improper absent some explanation why "it was probative of credibility rather than of a tendency to do bad acts"). Further, the Advisory Committee note to Rule 608(b) comments:

> Particular instances of conduct . . . may be inquired into on cross examination of the principal witness himself . . . . Effective cross examination demands that some allowance be made for going into matters of this kind, but the possibilities of abuse are substantial. Consequently safeguards are erected in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite . . . . Also, the overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury . . . .

"From the foregoing, it is evident that the type of inquiry into specific conduct of the witness for impeachment purposes is quite limited." *United States v. Bocra*, 623 F.2d, 281, 288 (3d Cir. 1980). "The classic example of a permissible inquiry would be an incident in which the witness had lied." *Id*. Further, while the Sixth Amendment guarantees a defendant the right to cross-examine witnesses, it allows a trial judge to place reasonable limits on the cross-examination. *United States v. Mussare*, 405 F.3d 161, 169 (3d Cir. 2005) (a district court retains "'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on

such cross examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986)). "The court balances a question's relevance to honesty and veracity with its prejudicial impact." *United States v. Dennis*, 625 F.2d 782, 798 (8th Cir. 1980).

In *Bocra*, the Third Circuit considered the defendant's claim that the defendant should be permitted to cross-examine an IRS agent regarding the agent's involvement in other bribery cases in order to attempt to show that the agent was a solicitor of bribes. The defendant claimed that he was entrapped by the agent, and needed to introduce evidence of the IRS agent's involvement in other bribery cases to show a pattern of solicitation by the agent, which would cast doubt on the defendant's predisposition to commit bribery. *Id*. at 285. The district court banned any such cross-examination because it determined that the marginal probative value of the testimony was outweighed by the risks of jury confusion. *Id*. at 287-88. On appeal, the Third Circuit determined that any cross-examination of the agent with respect to his involvement with other taxpayer bribes was "only marginally probative of truthfulness" and that the "probative value of the cross-examination was outweighed by the risk of confusing the jury by collateral exploration." *Id*. at 288.

In *United States v. Williams*, 464 F.3d 443 (3d Cir. 2006), a narcotics and firearms prosecution, the Third Circuit found that the district court did not abuse its discretion in barring cross-examination regarding testimony by the government's central witness that he had never committed murder. Defense counsel argued that he had information that this assertion was false. *Id*. at 448. Specifically, a confidential informant had told a federal agent "that the informant had

heard from another person that [the central witness] had once stabbed an individual to death in Philadelphia." *Id*. However, the agent found no record of the murder, nor could he find the person who provided this information to the confidential informant. *Id.* Based on the statement of the confidential informant, defense counsel wished to impeach the central witness on cross-examination. *Id*. The District Court denied the defense request under Federal Rules of Evidence 608(b) and 403. *Id.* The Third Circuit affirmed and noted that, even if the evidence of the murder was strong, "it was not clearly relevant to [the central witness's] truthfulness as a witness and had a strong potential to prejudice the jury." *Id*.

As in *Bocra* and *Williams*, the defendant should not be permitted to unfairly attack the character of witnesses at trial in matters that are unrelated to veracity, and may not present extrinsic evidence unrelated to veracity that is designed to attempt to attack the character of the witness. Other courts have quite properly limited or excluded altogether improper cross-examinations of witnesses designed to confuse the jury and cause unfair prejudice. *See, e.g., United States v. Nelson*, 39 F.3d 705, 709 (7th Cir. 1994) (district court properly excluded cross-examination concerning other robberies that were supposedly committed by two government witnesses); *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1464-65 (11th Cir. 1994) ("Anton's borrowing from his clients, while ethically questionable, is likewise irrelevant to his truthfulness as an expert. To infer untruthfulness from any unethical act paves the way to the exception which will swallow the Rule.") (internal citation and quotations omitted); *United States v. Townsend*, 31 F.3d 262, 267-69   (5th Cir. 1994) (district court properly restricted defendant's cross-examination of various government witnesses regarding falsification of corporate records and bad business practices, finding that it "would

only serve to mislead and confuse the jury, and prolong the trial"); *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 839 (10th Cir. 1988) (probative value of evidence showing that one of defendant's agents embezzled $40,000 in connection with plaintiff's lease was greatly outweighed by risk of unfair prejudice); *United States v. Dennis*, 625 F.2d 782, 798 (8th Cir. 1980) (proper to exclude defendant from cross-examining victim-witness on prior arrest for tax problems because not related to veracity); *United States v. Hill*, 550 F. Supp. 983, 989 (E.D. Pa. 1982) (in prosecution for distributing heroin, it was proper to refuse to allow inquiry into charges of misconduct against DEA agent who directed investigation where challenged conduct was unrelated to investigation, agent was cleared of wrongdoing, and nature of charges was not related to agent's character for veracity).

"Trials are about charges in the indictment, not the character of the witnesses. Thus, although Federal Rule of Evidence 608(a) permits a party to introduce evidence regarding a witness's reputation for truthfulness, Rule 608(b) does not permit specific instances of a witness's conduct to be proved by extrinsic evidence." *United States v. Miller*, 91 F.3d 1160, 1163 (8th Cir. 1996) (internal quotations and citations omitted). *See also United States v. McNeill*, 887 F.2d 448, 453 (3d Cir. 1989) ("This court has construed Rule 608(b) as requiring the exclusion of extrinsic impeachment evidence concerning a witness' prior instances of conduct.").[8]

---

8  Moreover, Federal Rule of Evidence 611(a)(3) prohibits the harassment and undue embarrassment of witnesses. *See also* McCormick, Evidence § 41 (7th ed. 2013) ("Some of the factors that should inform the exercise of the discretion [under Rule 608(b)] are: (1) whether the witness's testimony is crucial or unimportant, (2) the relevancy of the act of misconduct to truthfulness, (3) the nearness or remoteness of the misconduct to the time of trial, (4) whether the matter inquired into is likely to lead to time-consuming, distracting explanations on cross-examination or re-examination, and (5) whether there will be unfair humiliation of the witness and undue prejudice to the party who called the witness.").

Accordingly, Myers should not be permitted to attack the character of the government's witnesses on matters that are not related to veracity.

### D.      Prohibition of Using of Agents' Reports to Cross-Examine Witnesses.

The government has provided Myers with reports of witness interviews by government agents.   To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents.   However, under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants.   *Id*. at 28.   One defendant sought to cross-examine the agent with interview notes taken by an Assistant U.S. Attorney who had interviewed the agent. *Id*. at 28-29.   The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant to impeachment and consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. . . . Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id*. at 29 (citation omitted).

As a matter of evidence, the burden "of proving that notes reflect the witness's own words rather than the note taker's characterization falls on the party seeking to introduce the

notes." *Id*. Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness's statement. *See id*. at 30. In the absence of such proof, cross-examination from such reports or notes should not be permitted. *See also United States v. Barile*, 286 F.3d 749, 757-58 (4th Cir. 2002); *United States v. Adames*, 56 F.3d 737, 744-45 (7th Cir. 1995); *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993).9

E. **Recalling Case Agents to the Witness Stand.**

During the course of trial, the government may recall agents and investigators to the witness stand to address a number of different subjects, given that the charges at issue involve five separate schemes. While it may be possible for the agents and investigators to testify about several of these topics in a single appearance on the witness stand, such a constraint may not promote an efficient or clear presentation of the case. Thus, the government may recall agents and investigators so that their testimony can be provided in parts, either by subject matter, or chronologically, as required for a clear and concise presentation of the case.

This procedure has been endorsed by numerous courts. *See, e.g., United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases that have approved of the practice; noting that Federal Rule of Evidence 611(a) authorizes the Court to control the order of interrogation and the presentation of evidence); *United States v. Coleman*, 805 F.2d 474, 482 (3d Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness

---

9 Given that the agent reports in this case were not adopted by the witnesses and are not verbatim transcripts, they are not Jencks statements that should be produced under 18 U.S.C. § 3500. Nevertheless, the government in this district has long acted as a matter of grace to produce the reports pretrial to aid a defendant's preparation of the case. That does not change the fact that the statements may not be used to impeach.

has consulted with the prosecutor in the interim."); *United States v. Butera*, 677 F.2d 1376, 1381
(11th Cir. 1982) (district court had discretion under Rule 611(a) to permit case agent to take the
stand on four separate occasions to describe events in chronological order); *United States v.
Jackson*, 549 F.2d 517, 528 (8th Cir. 1977) (praising the district court's exercise of its discretion
as lending "a praiseworthy degree of order to this complicated trial"); *United States v. Rodgers*,
2014 WL 3735585, at *2 (W.D. Pa. July 28, 2014) (permitting recall of certain law enforcement
witnesses so the government may present its evidence chronologically); *United States v. Dimora*,
843 F. Supp. 2d 799, 822-23 (N.D. Ohio 2012) (approving the recalling of a government witness
because it will provide a clear and orderly trial and aid the jury's understanding of the evidence);
*United States v. Bacon*, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (permitting recall of
police detective so the government may present its evidence chronologically); *United States v.
Johnson*, 434 F. Supp. 2d 301, 305-06 (D. Del. 2006) (recall of a DEA chemist was appropriate).
Given the five different schemes charged in the Superseding Indictment, the government submits
that a similar procedure, if necessary, should be permitted here.

F.      **Evidence of Plea Agreements, Immunity, and Dishonesty**

The government may attempt to offer evidence of its witnesses' dishonest conduct, guilty
pleas, plea agreements, and other forms of immunity during the direct examination of some of its
witnesses.   An *en banc* panel of the Third Circuit has recognized that such impeachment
evidence properly can be offered during the government's direct examination of its witnesses.
*In United States v. Universal Rehabilitation Services (PA), Inc.*, 205 F.3d 657 (3d Cir. 2000), the
Court observed that there were at least three reasons to permit the government to adduce
evidence of a testifying witness's guilty plea or plea agreement, to include allowing the jury

accurately to assess the credibility of the witness and to explain how the witness has first-hand knowledge concerning the events about which the witness was testifying. 205 F.3d at 665-67. The Third Circuit also held that the government could adduce such evidence even in the absence of an affirmative challenge to witness credibility because in every case jurors are instructed that they must determine the credibility of the witnesses who testify. *Id*. at 666. *See United States v. Montani*, 204 F.3d 761, 765 (7th Cir. 2000) ("The well-settled rule in this Circuit allows the government to take the sting out of a defendant's cross-examination by introducing evidence of a co-defendant's plea agreement as part of its case in chief.").   This reasoning applies to grants of immunity, as well. *See Montani*, 204 F.3d at 765-66 ("introducing evidence of a witness's guilty plea or immunity deal serves the 'truth-seeking' function of the trial by presenting all relevant aspects of the witness's testimony at one time").

The government recognizes, however, that the introduction of such evidence only may be for a proper purpose.   In this regard, for instance, the government may not argue that a witness's guilty plea, or that the grant of immunity to a witness, is substantive proof of the defendant's guilt.   205 F.3d at 668.   The Third Circuit has suggested a cautionary instruction to the jury, which, it has held, insulates the defendant from any prejudicial effect. *Id*. at 668.   The Third Circuit has observed that the jury in such cases should be instructed that it may not consider the guilty plea and/or plea agreement as evidence that the defendant is guilty of the offenses with which he is charged, but rather that such evidence is offered only to allow the jury, for instance, to assess the witness's credibility.   *Id*.   *See also Montani*, 204 F.3d at 767 (suggesting similar cautionary instruction).   The Court can employ a similar instruction here. *See, e.g.,* Third Circuit Model Instruction 4.19.

### G.      Arguments for Jury Nullification

This case is about defendant Myers' guilt or innocence of the charges set forth in the Superseding Indictment, not about anyone's political motivation or party affiliation. Accordingly, Myers should be precluded from presenting evidence or arguing to the jury that the jury should reach a verdict based on any consideration other than the evidence presented at trial, including any bias or prejudice associated with local or national politics.

Jury nullification is "a jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue…or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *United States v. Boone*, 458 F.3d 321, 328 n.2 (3d Cir. 2006) (quoting *Black's Law Dictionary* 875 (8th ed. 2004).   In *Boone*, the Third Circuit explained that a juror wo "commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role." *Id.* at 326.   The federal courts "categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."   *United States v. Carr*, 424 F.3d 213, 220 (2d Cir. 2005) (quoting *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997)).

Introducing evidence in favor of jury nullification also violates Federal Rules of Evidence 401 and 402.   Rule 401 defines "relevance" as "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."   Rule 402 provides that irrelevant evidence is inadmissible.   Evidence in support of jury nullification has no tendency to make the existence of any fact related to guilt or innocence more or less probable, and therefore it is not admissible.

Accordingly, the trial court may preclude defense attorneys from attempting to present evidence or arguments in favor of jury nullification.   *United States v. Moss*, 297 Fed. Appx. 839, 841 (11th Cir. 2008); *United States v. Rosenthal*, 454 F.3d 943, 946-47 (9th Cir. 2006); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993).

In this case, Myers may attempt to argue to the jury that he should be acquitted for reasons other than the evidence presented at trial of guilt or innocence.   Any appeal to the political affiliations or party loyalties of the jurors should be precluded.   Any unsupported allegations of selective prosecution based upon Myers' political affiliations or suggestions that the prosecution was politically motivated should also be precluded.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney

By:

/s/   Eric L. Gibson
ERIC L. GIBSON
RICHARD P. BARRETT
Assistant United States Attorneys

Dated: May 23, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Trial Memorandum has

been served upon all counsel of record electronically and via ECF.


s/Eric L. Gibson
ERIC L. GIBSON
Assistant United States Attorney


Dated: May 23, 2022