# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | NO. 20-CR-210 |
| MICHAEL "OZZIE" MYERS | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant, Michael "Ozzie" Myers, was charged in a thirteen-count superseding indictment with crimes arising out of his participation in ballot box stuffing schemes in south Philadelphia's 39th Ward, 36th Division and the 39th Ward, 2nd Division over several years. Defendant Myers was an influential political consultant who participated in the schemes with members of the Board of Elections in both polling stations, including the Judges of Elections and other board officials in those wards, some of whom he installed behind the scenes.  On June 6, 2022, Myers pled guilty to Counts 1, 2, 8, 10, and 12 of the superseding indictment, charging him with conspiracy to deprive persons of civil rights, in violation of 18 U.S.C. § 241 (Count 1), Travel Act bribery, in violation of 18 U.S.C. § 1952(a)(3) (Count 2), obstruction, in violation of 18 U.S.C. § 1512(b)(3) (Count 8), falsification of voting records, and willfully causing the falsification of voting records, in violation of 18 U.S.C. §§ 1519 and 2 (Count 10), and conspiring to illegally vote in a federal election, in violation of 52 U.S.C. § 10307(c) (Count 12), all arising from his actions over a period of years in organizing and directing ballot stuffing schemes in south Philadelphia's 39th Ward, 36th Division and the 39th Ward, 2nd Division.[1]

---

[1] At sentencing, the government will move to dismiss Counts 3, 4, 5, 6, 7, 9, 11, and 13 of the superseding indictment.

Specifically, the evidence introduced at the defendant's change of plea hearing established that Myers, a former member of the U.S. House of Representatives from Pennsylvania's First District, hired himself out as a "political consultant." As a "consultant," Myers held himself out as an effective and successful political operative capable of ensuring his clients' electoral success. Myers' criminal efforts were generally, although not exclusively, directed at securing election victories for local judicial candidates running for Philadelphia's Court of Common Pleas or Municipal Court who had employed Myers as a "political consultant." Myers also exercised influence and control in Philadelphia's 39th Ward by distributing cash payments to various election officials and supporting family, friends, and allies for elective office in the 39th Ward. Myers installed Ward Leaders, Judges of Elections, and Democratic State Committee Persons in south Philadelphia Wards.[2]

Myers, a savvy veteran of high-stakes political campaigns, repeatedly abused his position as a trusted political consultant, to gain  unfair and illegal advantages for his clients, and to deprive voters of Philadelphia of the information that could have exposed his schemes. Further, defendant Myers' crimes were far from aberrant:  information obtained by the government established that repeatedly he bribed elections officials, "stuffed" ballot boxes, and caused the falsification of elections, all to influence the outcome of political campaigns and further his influence as a political operative. Moreover, when the FBI investigated his illegal conduct, he schemed to obstruct that federal investigation to maintain the illegal benefits he had obtained or provided for his clients, and to protect himself and his coconspirators from exposure.[3]

---

[2] Among the allies he inserted as election officials in South Philadelphia over the years were the two cooperating witnesses discussed below.

[3] Myers' obstructive conduct is particularly striking given his past. As discussed below, as a

*continued* . . .

Accordingly, this Court should impose a significant sentence of incarceration within the recommended Guidelines range.[4]  A sentence within that range will reflect the grave seriousness of Myers' repeated, willful violations of the nation's elections laws.

## I.    LEGAL BACKGROUND

The Third Circuit has set forth a three-step process for sentencing by district courts following *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)).  In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same

---

United States Congressman, Myers was the first congressman to  accept bribes on video during the Abscam federal sting operation in the Seventies.  Myers is no stranger to federal law enforcement, and his obstructive conduct here was deeply rooted in his own experience.  Among other things, during the commission of the instant offenses, Myers provided a government cooperator with false explanations for the exchange of money in the event law enforcement inquired.  He also discussed with the cooperating witness his suspicions that the FBI was investigating and possibly recording conversations around Myers' election work.

[4]  The parties have agreed that they will not seek either an upward or a downward departure under the Sentencing Guidelines.  However, the terms of the plea agreement permit Myers to contend that there are circumstances supporting a downward variance from the Sentencing Guideline range.  The government, however, disagrees with Myers' assessment and urges this Court to reject his motion and argument in support of a variance.

fashion as was employed prior to the *Booker* decision.  *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it."  *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).  *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, -- F.3d --, 2014 WL 3450938, *2 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

Here, the sentence imposed must, most importantly, promote respect for the law and deter others who would destroy confidence in the integrity of the electoral process by committing similar offenses in pursuit of elected office and political power.  *See* 18 U.S.C. § 3553(a)(2).

## II.   FACTUAL BACKGROUND

### 39th Ward, 36th Division

The FBI uncovered Myers' efforts to undermine elections in the 39th Ward, 36th Division by carefully examining voting records and developing cooperating witnesses. The evidence included:: 1) the poll books for the 39th Ward, 36th Division; 2) the machine Results Receipts for the two voting machines in use at the 39th Ward, 36th Division; 3) the accounts of the cooperating

witnesses;[5] 4) toll records for Myers' cellular telephone; 5) Campaign Finance Reports (CFRs) for Myers' candidates; and 5) recordings made by Domenick DeMuro of his conversations with Myers heading into the 2016 general election and the 2017 election cycle.

Myers regularly solicited monetary payments as consulting fees from candidates for elective office.  A significant portion of his clients were candidates for judgeships in Philadelphia's Court of Common Pleas or Municipal Court.   Payments from the candidates to Myers took the form of cash or checks, sometimes blank checks signed purportedly by a representative of the candidates' campaigns.

In the 39th Ward, after receiving the money, Myers  took portions of these funds and make payments to DeMuro, who was the Judge of Election in the 39th Ward, 36th Division.[6] These payments from Myers took the form of checks or, more frequently, cash.  In return, DeMuro tampered with the election results in support of Myers' clients.

After DeMuro received payments from Myers ranging from between $300 to $5,000 per election, he would "ring up" votes for Myers' preferred candidates by fraudulently and surreptitiously manipulating the vote totals on the voting machines in the 39th Ward, 36th Division. This increased the number of votes recorded for Myers' clients, thereby diluting and distorting the ballots cast by actual voters.

In the run up to Election Day, Myers  relayed instructions to DeMuro via cellular

---

[5]  As set forth below, Domenick DeMuro was the Judge of Election in the 39th Ward, 36th Division, who agreed to "ring up" votes for Myers's client candidates in exchange for bribe payments.

[6]  As the Judge of Elections for the 39th Ward, 36th Division, DeMuro recruited the other members of the Board of Elections from his family (including his spouse), friends, and neighbors to serve at that polling place.

telephones capable of interstate transmissions regarding which candidates DeMuro should "ring up" or add fraudulent votes for during Election Day in the 39th Ward.

More specifically:

● On May 20, 2014, DeMuro and/or his associates on the Board of Elections added 27 fraudulent ballots during the primary election in the 39th Ward, 36th Division, on behalf of Myers' preferred candidates running for judicial office in the First Judicial District of Pennsylvania.  In other words, according to the numbers documented in the machine results, 118 voters exercised the franchise on Primary Election Day.  The Results Receipts from the voting machines document 118 ballots cast during the primary election in the 39th Ward, 36th Division, even though only 91 voters physically appeared ]at the polling station to cast ballots.  Those 91 voters who actually appeared had to sign the polling book.  The ballot for this primary election included candidates for a federal elected office.

● On May 19, 2015, DeMuro and/or his associates on the Board of Elections added 40 fraudulent ballots during the primary election in the 39th Ward, 36th Division, on behalf of Myers' preferred candidates running for judicial office in the First Judicial District of Pennsylvania.  DeMuro told investigators that prior to this election, Myers gave him a total of $2500 to add votes to three judicial candidates that Myers acted as a consultant for.  DeMuro told investigators that his Election Board turned in to the office of the Philadelphia City Commissioners the Results Receipts from voting Machine # 021873 and Machine # 021874. The Results Receipts from the machines documented 259 ballots cast during the primary election in the 39th Ward, 36th Division, even though only 219 voters physically appeared at the polling station to cast ballots, as reflected in the polling book.  The ballot for this primary election did not include a candidate for federal elective office.

● DeMuro told investigators that on April 26, 2016, he and/or his associates on the Board of Elections added 46 fraudulent ballots during the primary election in the 39th Ward, 36th Division, on behalf of Myers' preferred candidates. DeMuro explained to investigators that he received payments from Myers to "ring up votes" on the 2016 primary ballot.  After the polls closed, DeMuro and his Election Board turned in to the office of the Philadelphia City Commissioners the Results Receipts from voting Machine # 021873 and Machine # 021874. The Results Receipts documented 266 ballots cast during the primary election in the 39th Ward, 36th Division, even though only 220 voters physically appeared at the polling station to cast ballots as reflected in the polling book.  The ballot for this primary election included candidates for a federal elected office.

During the investigation, the government obtained audio recordings that were consensually made by DeMuro of his conversations with Myers heading into the 2016 general election and the 2017 election cycle.  In the recordings, Myers: a) instructed DeMuro not to discuss the "ballot stuffing" over the telephone; b) advised DeMuro to conceal the receipt of money from Myers by providing fictitious names to be listed as the payee on checks drawn on the campaign accounts of defendant Myers' preferred candidates and unwitting clients by telling DeMuro, "I'm gonna get you a couple checks there's no question about that. If you want to give me a - a different name than Domenick DeMuro that's your business…;" c) advised DeMuro that defendant Myers would hand DeMuro payments in the form of checks after the deadline for the last campaign finance report prior to the May 2017 primary election because, "you don't wanna - you don't wanna be on any [candidate's campaign finance] report May 7th when the election is May 16th;" d) instructed DeMuro sign receipts for bribe payments in the form of cash and counseling DeMuro that "if there was ever a question Dom . . . you know you'd say well I gave

the money out Election Day [to get out the vote];" and, e) provided a check to DeMuro drawn on the campaign account of defendant Myers' client candidate and made payable to DeMuro's spouse and later falsely characterized on the unwitting candidate's campaign finance report as supporting a "get out the vote" effort.

### 39th Ward, 2nd Division

Myers also joined with Marie Beren, formerly the Judge of Elections for the 39th Ward, 2nd Division, to manipulate the vote totals on the voting machines in Philadelphia's 39th Ward, 2nd Division, to increase the number of votes recorded for certain candidates.  In approximately 1988, defendant Myers recruited Beren to serve as a Judge of Elections for Philadelphia's 39th Ward, 2nd Division.  Beren formally served as the Judge of Elections for Philadelphia's 39th Ward, 2nd Division from 1988 through 2015.  Beginning in approximately 2010, the polling location for the 39th Ward, 2nd Division moved to the Seafarer's Union Hall located at 4th and Shunk Streets in Philadelphia, Pennsylvania.  The Seafarer's Union Hall was also the polling location for the 39th Ward, 11th Division and the 39th Ward, 16th Division.  There, Beren became the *de facto* Judge of Elections for all three divisions.  Even after Beren "stepped down" from her position following the 2015 Primary Election, she continued to operate as the *de facto* Judge of Elections from a position as a "poll watcher."

While Beren effectively ran the polling places for Philadelphia's 39th Ward, 2nd Division, the 39th Ward, 11th Division, and the 39th Ward, 16th Division, defendant Myers gave Beren directions to add votes to candidates supported by him, including candidates for judicial office whose campaigns actually hired Myers, and other candidates for various federal, state, and local elective offices preferred by Myers for a variety of reasons.

According to Beren, on almost every Election Day, Myers transported her to the polling

station to open the polls.  During the drive to the polling station, Myers  advise Beren which candidates he was supporting so that Beren understood which candidates should be receiving fraudulent votes.

While the polls were open, Beren  advised actual in-person voters to support Myers' candidates and also cast fraudulent votes in support of Myers' preferred candidates on behalf of voters she knew would not or did not physically appear at the polls.

During Election Day itself, Myers conferred with Beren via cellular telephone while she was at the polling station about the number of votes cast for his preferred candidates.  Beren reported to Myers how many "legit votes," meaning actual voters, had appeared at the polls and cast ballots.  If actual voter turnout was high, Beren  added fewer fraudulent votes in support of Myers' preferred candidates.  From time to time, Myers instructed Beren to shift her efforts from one of his preferred candidates to another.  Specifically, Myers  instructed Beren "to throw support" behind another candidate during Election Day if he concluded that his first choice was comfortably ahead.

Beren and the individuals she recruited to serve as Election Board Officials  falsified the polling books and the List of Voters and Party Enrollment for the 39th Ward, 2nd Division, by recording the names, party affiliation, and order of appearances for voters who had not physically appeared at the polling station to cast his or her ballot in the election.  Beren  then cast fraudulent ballots purportedly on behalf of these eligible voters who had not, in fact, appeared in person to cast ballots themselves.  Beren took pains to ensure that the number of ballots cast on the machines reflected the number of voters signed into the polling books and the List of Voters.

After the polls closed on Election Day, Beren  certified the Voting Machine results from the 39th Ward, 2nd Division, by attesting to the accuracy of the paper results receipt placed in the

Cartridge-Results Bag with the memory cartridge from each Voting Machine for delivery to the City Commissioners.

Specifically, Beren followed Myers' instructions during the election held on November 7, 2017 which resulted in fraudulent votes being cast and tabulated on behalf of Myers' preferred candidates.[7]  Consequently, Myers' accomplices and co-conspirators falsified the polling books and the List of Voters and Party Enrollment for the 39th Ward, 2nd Division, by recording the names, party affiliation, and order of appearances for voters who had not physically appeared at the polling station to cast his or her ballot in that election.

Similarly, on November 6, 2018,[8] Myers' accomplices and co-conspirators cast fraudulent votes on behalf of Myers' preferred candidates.  They also falsified the polling books and the List of Voters and Party Enrollment for the 39th Ward, 2nd Division, by recording the names, party affiliation, and order of appearances for voters who had not physically appeared at the polling station to cast his or her ballot during that election.

## III.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence.

The Court may impose the following statutory maximum sentences:  Count 1 (conspiracy to deprive persons of civil rights), ten years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count 2 (Travel Act bribery), five years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count 8 (obstruction), twenty years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; Count 10 (falsification of voting

---

[7]  The ballot for this election did not include a candidate for federal elective office.

[8]  The ballot for this election included candidates for federal elective office.

records), twenty years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count 12 (conspiring to illegally vote in a federal election), five years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

The total maximum sentence is therefore sixty years' imprisonment, a three-year period of supervised release, a $1,250,000 fine, and a $500 special assessment.

**B.**   **Sentencing Guidelines Calculation.**

**1.**   **The USSG Guideline Range**

The Probation Office correctly calculated the defendant's advisory Guideline range at 30–37 months incarceration.[9]  The defendant's final combined adjusted offense level was 19.  The details of the calculation are as follows:

| | | |
|---|---|---|
| **Group One**<br>**Counts 1, 2, and 8** | Base offense level, USSG §§ 3D1.3, 2E1.1, 2E1.2(a)(2), 3C1.1(a)(2) | 12 |
| | Specific Offense Characteristic, § 2C1.1(b)(1) (multiple bribes) | +2 |
| | Specific Offense Characteristic, § 2C1.1(b)(3) (bribery of public official in sensitive position) | +4 |
| | Obstruction of Justice, § 3C1.1 | +2 |
| | **TOTAL Group One** | **20** |
| **Group Two**<br>**Counts 10 and 12** | Base offense level, USSG §§ 3D1.3(a), 2J1.2 2E1.2 | 14 |
| | Specific Offense Characteristic, § 2J1.2(b)(3) (alteration of substantial number of records, alteration of essential records, otherwise extensive) | +2 |
| | Specific Offense Characteristic, § 3B1.1(a) (organizer, leader) | +4 |
| | **TOTAL Group Two** | **20** |
| Combined Adjusted Offense Level | Increase in Offense Level for Multiple Groups, § 3D1.4 | +2 |

---

[9] The applicable guideline range is in Zone D of the Sentencing Table.  The defendant is therefore ineligible for probation under the guidelines.  USSG § 5B1.1, comment (n.2).

| | COMBINED ADJUSTED OFFENSE LEVEL | 22 |
|---|---|---|
| Adjustment for Acceptance of Responsibility | Acceptance of Responsibility, § 3E1.1(a) | -2 |
| Adjustment for Timely Notice | Timely Notice of Acceptance of Responsibility, Notification to Authorities § 3E1.1(b)[10] | -1 |
| | TOTAL OFFENSE LEVEL | 19 |
| | CRIMINAL HISTORY I11 | I |
| | FINAL GUIDELINE RANGE | 30–37 months incarceration |

## IV.    18 U.S.C. § 3553(a) FACTORS

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[12]

---

[10] The government agrees that defendant Myers has assisted the government by providing timely notification of his intent to plea guilty and therefore moves for an additional one-level decrease pursuant to USSG § 3E1.1(b).

[11] Defendant's criminal history category is not the result of an absence of criminal convictions. PSR ¶¶ 70, 72-78.  Rather, his last federal criminal conviction was not part of the calculation because of its age.  PSR ¶¶ 77-78; USSG § 4A1.1(b), comment (n.1).

[12] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a

*continued . . .*

Here, the nature and seriousness of the offenses, which were carefully and deliberately calculated to corrupt multiple elections, and the need to promote respect for the law and afford adequate deterrence are especially weighty factors that require a significant period of incarceration.

### A.     The nature and circumstances of the offense

A significant sentence of incarceration squarely within the Guidelines is appropriate in this case because of the nature and circumstances of Myers' crimes, which were neither isolated nor the product of a single criminal choice.  During the elections identified in the superseding indictment, Myers' repeated acts of bribery and ballot stuffing struck at the core goal of the federal election laws:  fairness in elections free of corrupt dealings.

While many Americans, including other campaign consultants and professionals, who desired a particular outcome to the elections knocked on doors, toiled at phone banks, or found any number of other legal ways to make their voices heard, Myers was not content with lawful means, and sought to influence these elections on behalf of his candidates from the shadows.  He did so by orchestrating secret and illegal bribe payments to an election official in the 39th Ward, 36th Division that disadvantaged his candidates' opponents who were playing by the rules and operating within the law.  He also installed and later corrupted the judge of elections in the 39th Ward, 2nd Division.  In the process, Myers deceived the voting public in various election cycles

---

sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (*quoting United States v. Navedo Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

by hiding facts that he believed would have exposed him and could have had a substantial effect on the voters' preferences.

Myers endeavored to subvert a process across multiple election cycles that Congress and the Commonwealth of Pennsylvania have painstakingly sought to maintain as a guarantor of integrity and fairness in federal elections.  The sentence imposed should reflect the seriousness of Myers' flagrant violations of the election laws, and counter the public cynicism that arises when insiders like Myers behave as though the rules do not apply to him or his candidates or will not be enforced.  The voting public needs to know that the electoral process belongs to them, and not cynical and deliberately subversive operatives like Myers.

The sentence should also reflect the degree of willfulness and calculation by the defendant, which place his offenses in the category most amenable to general deterrence of others weighing similar schemes.  Myers demonstrated repeatedly that he knew exactly where the lines are drawn separating legal conduct from willful criminality, and he crossed those lines whenever it served his purposes.  Nothing illustrates this better than Myers' own words.

On Saturday, November 5, 2016, in a recorded call, Myers discussed a $300 check he had given to DeMuro, a cooperating witness.  Myers also instructed DeMuro not to give aid to a particular judicial candidate.

| | |
|---|---|
| Myers: | And I got a check in my pocket. |
| DeMuro: | For me? |
| Myers: | For you. |
| DeMuro: | Alright. When. |
| Myers: | Didn't you say you're gonna call me Saturday.  But I mean, if you, if you want to pick it up now you can, if you want to pick it up Monday, that's up to you. |

DeMuro"      I'll pick it up, cause I'm in Jersey right now, so I'll pick it up, probably try to pick it up Monday. You know what I mean.

Myers:       Ok.

DeMuro:      If you're home tomorrow, maybe I'll come down tomorrow, I don't know, you know what I mean, I don't know, you know, before the Eagles come on, you know what I mean.

Myers:       Yeah.

DeMuro:      Cause I don't move, I don't move away from the fucking TV when the Eagles are on.  You know what I mean.

Myers:       Yeah, it's up to you.

DeMuro:      Alright, I'll call you tomorrow, I'll call you tomorrow, but I'm in Jersey right now, I'll call you tomorrow.

Myers:       Yeah, I got a check for $300.00, for you.

DeMuro:      Ok, alright.

Myers:       And that's coming out of my pocket, just so you know.

DeMuro:      I know it is, I know it is, alright. I won't forget.

Myers:       You know there's, well I mean there's, no, I didn't, I don't I didn't hear of any money, I see people canvassing today around the neighborhood.  Uh, volunteers for [a federal candidate].

DeMuro:      Uh, I didn't, I didn't hear of any, [he/she] had that, [the candidate] had that [person] at the Ward meeting the other night, you know.

Myers:       Yeah well they, [he/she's] already uh, they already got [his/her] under their, under their wing.  [He/she] told me that [. . .] girl.  I spoke to [him/her] her uh the night of the dinner.  And I said uh, you know [he/she] came up to me, and I, of course, I know [him/her] from last, [he/she's] ran a bit, you know every two years for the last couple of cycles.

DeMuro:      [He/she] seemed like a nice per, [he/she] seemed like a nice person, you know that.

Myers:       Yeah, and I said well, you know, once you, once you can officially become really out there, I said you can uh, you know I said we'll talk, if I can help you in some way, you talk, we'll talk.  [He/she] said well I think I'm ok in South Philly, I already got uh [Ward Leader] and [another

- 15 -

person].  I said oh that's good, you'll probably do great.  So fuck [him/her], we won't be for [that candidate].

DeMuro:     Yeah.

Myers:      But hey, we'll be for [him/her], we'll be for [him/her] if she comes forward. [He/she] don't.

DeMuro:     Well, [he/she] seemed like a nice person.

On Monday, February 20, 2017, in a recorded call, Myers and DeMuro discussed who controlled the 39th Ward.  Myers told DeMuro that he intended to produce every vote he could for his candidates.

Myers:      I'm looking at a different situation now. And I'm looking about producing every vote that I can for my candidates, and of course you're a big part of that if you still want to be a part of it. And ya know if we get [Ward Leader] to accept what a normal ward leader would accept like $1,000 check, or maybe 15 hundred if [he/she] goes all the way. Then that'll be fine.

DeMuro:     No I'll be part- I'm- I'm part of it but you know I'm just not gonna.

Myers:      Ya know whatev- whatev- anything that I would do with that screwball [Ward Leader] would not be related to anything I would- you and I do.

On Wednesday, April 12, 2017, at a recorded in-person meeting, DeMuro called Myers and explained that on the upcoming Election Day, DeMuro intended to cast ballots for people who did not show up at the polling station.  That same day, at a recorded in-person meeting, Myers instructed DeMuro not to discuss ballot stuffing and the means to be employed over the phone.

DeMuro:     What I was saying to you was- tell me if I'm wrong. I'd rather take less money and do what I'm gonna do, I'm gonna vote for people that don't come in. I'm not gonna be pullin no more fuckin ya know levers. I'm gonna vote for people that don't come in.

Myers:      Yeah but you don't want to say that over the phone, it don't sound right.

DeMuro:     Yeah you're right.

- 16 -

| | |
|---|---|
| Myers: | You don't- that's why I said I'll talk to you in the car. You don't- you can't vote for people that don't come in, that means you're voting people that didn't show. |
| DeMuro: | But that's the- that's the deal I want to do that's ah- how I want to do it I want to vote people that don't come in. In other words if I know you're not comin' can I vote for you that's it. |
| Myers: | Is the people know it? |
| DeMuro: | I don't know. I don't know.  No they're not gonna know it- no they're not gonna know it no. |

On Tuesday, April 18, 2017, at a recorded in-person meeting, Myers told the DeMuro that he would provide him with checks from his candidates after May 7th to avoid the Campaign Finance Report (CFR) reporting period.  He also told DeMuro that the checks should be in someone else's name as the payee.  During the conversation, DeMuro told Myers that a certain candidate would win the 39th Ward, 36th Division.

| | |
|---|---|
| Myers: | May 7th these candidates that's their- that's their last report that's gotta be reported in their campaign filing structure. |
| DeMuro: | Oh okay. |
| Myers: | Ah before election. Now I'm gonna get you some checks but they're not gonna be till after the 7th. And they won't show up till the end of June. So it'll be long after the fuckin election and definitely whoever lost they don't even fucking look anymore. |
| DeMuro: | No they don't care no more. |
| Myers: | No it's over.  And you don't wanna- you don't wanna be on any report May 7th when the election is May 16th. You follow? |
| DeMuro: | Yeah I know, I gotcha. |
| Myers: | Now, it- let me just follow up with this. I'm gonna get you a couple checks there's no question about that. If you want to give me a- a different name than Domenick DeMuro that's your business. |
| DeMuro: | Nahh I'm so . . .you know Oz I'm so afraid anymore I- I... |

| Myers: | Well I'm- I'm just I don't wanna hear no more about it but I'm tellin ya if- if- if Domenick Jones is somebody that I'm interested in and the- this part of the city and he has a legitimate address I don't care what his name is. |

On Tuesday, May 2, 2017, at a recorded in-person meeting, after a discussion about low voter turnout, Myers told the DeMuro, "people like you are going to be very important." Myers again discussed putting the checks for the DeMuro in a different name as the payee.  DeMuro reminded Myers of what the DeMuro did for one of Myers' judicial candidates in the 2011 campaign.

| DeMuro: | Yo, what's goin on Mike? |
| Myers: | Well a lot of craziness. |
| DeMuro: | It's been- I'll tell you this was a quiet election. |
| Myers: | That's why people like you are gonna be so important. |
| DeMuro: | Why? |
| Myers: | Cuz you can produce votes. |
| DeMuro: | Oh, yeah I can produ- yeah. Listen I'm gonna produce them the only way I know how to produce them ya- I mean ya know . . . |
| DeMuro: | Who is it? |
| Myers: | Listen now you know I'm gonna get you a couple checks and if you want a- if you want them in ah your son's name or in your grandmother's name. |
| DeMuro: | Nah my name, you can put them in my name I don't give a fuck I mean. |
| Myers: | Listen all you gotta- if there was ever a question, Dom, you see those vouchers that you signed… |
| DeMuro: | Yeah. |
| Myers: | Then you know you'd say well I gave the money out Election Day. |
| DeMuro: | Well I- I gotta- I ya know listen. |
| Myers: | Ya know- ya know I know you give some of it out anyway but the point is . . . |

DeMuro:        Listen you wanna- you- I- I don't wanna take- listen here's what I don't
               want to do I tell you this a long time ago. I don't wanna take money from
               somebody and not show results. So that's why I said to you- you said
               don't talk on the phone I'm not talking on no more phone.

Myers:         Exactly, Yeah.

DeMuro:        That's why I only- the only system I got now is to do people that ain't
               gonna come out, I'm gonna vote for them because, because I'm not takin
               money from a person and then they're gonna think . . .  like- like [prior
               judicial candidate]. Now [prior judicial candidate] I was good to [him/her]
               I put a lot of votes on for [him/her] because he gave money. Ya know I
               don't want to take people's money. I don't do what [Ward Leader] does
               Oz, I don't do that you know what I mean.

On Monday, May 8, 2017, at a recorded in person meeting, Myers told DeMuro which

candidates they would be pushing in the Primary Election.  Myers provided a $1,000.00 check

from a judicial campaign, made out to DeMuro's family member.  Investigators have obtained a

copy of the check and it is reported on the judicial candidate's Cycle 2 campaign finance report

for "GOTV."

Myers:         Here's the other thing. [Judicial candidate] is- is one of my main
               candidates,

DeMuro:        Okay.

               . . .

Myers:         But this is basically who I'm for, [judicial candidate] obviously [another
               judicial candidate] that's [union leader's] guy. (UI) [He/she]'s endorsed,
               the other endorsed candidate . . .

DeMuro:        I heard [another judicial candidate] got the bar.

Myers:         You got it?

DeMuro:        [He/she] got the bar.

Myers:         [He/she] He never called me, I spoke to him . . . I (UI) spoke to you. (UI)
               Can't believe it. Um and I'm also for [another judicial candidate]. Now
               I'm not against the [another judicial candidate] I'm for [him/her] too . . .
               Now this [candidate] I'm with, just put it in a different color, this one we
               could get some ya know, we could do some stuff for it. We're just gonna
               put that a little like that [candidate] . . ..

On Monday, May 8, 2017, at a recorded in person meeting, the DeMuro told Myers that he will put a particular judicial candidate "through the roof" and that he will "do what I got to do."

Myers:      Ya know we gotta put [judicial candidate] through the roof and like over where you're at you gotta put [another judicial candidate] through the roof and…

DeMuro:   Well you know how I'm gonna put [him/her] through the roof I'm gonna- I'm gonna put him-listen I'll put them both through the fuckin roof you can bet that.

Myers:      And the other one that we gotta do is uh- is uh you know our candidate for ah we can't to [candidate for local office] we gotta do ah [another candidate for local office].

On Monday, May 16, 2017, at a recorded in person meeting, DeMuro told Myers that he will be distributing money to other officials, paying them each $100.00, for them to "ring up votes."  In response, Myers replied "ok."

On Monday, May 22, 2017, at a recorded in person meeting, DeMuro told Myers falsely that he "added about 12 votes."[13]  Myers asked DeMuro if he gave the other officials money and inquired whether they helped on Election Day.

DeMuro:   Well, ya know look, let me tell you something Oz this was a hard election. I got about 78 out and I added about 12 votes or I woulda got nothing out, nothing. Ya know I mean ah, I don't know ah, [he/she'll] be calling me because I know [he/she's] gonna keep- she talked to me [he/she] said I had to check the divisions you know cuz ah, what's [his/her] name ah, I mean legitimately [he/she] lost ah, what the hell's [his/her] name, the [candidate].

Myers:      Yeah . . .

Myer:       What about those receipts you got for me, did you get them?

DeMuro:   I'll get them, I'll get them.

---

[13] On this occasion, DeMuro did not, in fact, add additional votes on Myers' behalf and he turned the cash into the FBI.

Myers:        Did they help? Did you give them the money? Did they help?

DeMuro:    Yeah I don't know if they helped I haven't checked. I really haven't I
            swear to god I have not checked. I haven't checked I need to I haven't
            checked.

Not only was Myers aware of what he was doing, but he employed sophisticated means
to conceal his misconduct in layer upon layer of deception.  Only a serious sentence will deter
such seriously designed and executed crimes.

Myers compounded already serious crimes when he obstructed justice.  The evidence
establishes the Myers: a) instructed cooperating witness not to discuss the "ballot stuffing" over
the telephone; b) advised him to conceal the receipt of money from Myers by providing fictitious
names to be listed as the payee on checks drawn on the campaign accounts of defendant Myers'
preferred candidates and unwitting clients by telling the DeMuro, "I'm gonna get you a couple
checks there's no question about that. If you want to give me a - a different name than [your]
that's your business…;" c) advised the DeMuro that defendant Myers would hand him payments
in the form of checks after the deadline for the last campaign finance report prior to the May
2017 primary election because, "you don't wanna - you don't wanna be on any [candidate's
campaign finance] report May 7th when the election is May 16th;" d) had the DeMuro sign
receipts for bribe payments in the form of cash and instructed the DeMuro that "if there was ever
a question . . . you know you'd say well I gave the money out Election Day [to get out the vote];"
and, e) provided a check to the DeMuro drawn on the campaign account of defendant Myers'
client candidate and made payable to the DeMuro's spouse and later falsely characterized on the
unwitting candidate's campaign finance report as supporting a "get out the vote" effort.

B.        **History and characteristics of the defendant**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge

to consider every convicted person as an individual and every case as a unique study in the

human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

ensue." *United States v. Koon*, 518 U.S. 81, 113 (1996).  Here, an evaluation of Myers' criminal

failings - even when balanced against his less objectionable conduct – compels a sentence of

incarceration.

## ABSCAM

Myers'  infamous prior conviction is well-documented.

> "Abscam" is the code word given by the Federal Bureau of Investigation to an
> undercover "sting" operation conducted out of the FBI office at Hauppauge, Long Island,
> New York, under the supervision of agent John Good. Abscam began after Melvin
> Weinberg in 1977 was convicted in the Western District of Pennsylvania on his plea of
> guilty to fraud. In return for a sentence of probation Weinberg agreed to cooperate with
> the FBI in setting up an undercover operation similar to the London Investors, Ltd.
> "business" that Weinberg had used with remarkable success before his arrest and
> conviction in Pittsburgh.

*United States v. Myers*, 527 F. Supp. 1206, 1209 (E.D.N.Y. 1981).  Still, even by the sordid

standards of criminality there, Myers distinguished himself.

> Myers was the first congressman to take money in front of the Abscam TV cameras. He
> did so in a hotel room at Kennedy Airport on August 22, 1979 in the presence of
> [Angelo] Errichetti, [FBI Special Agent Anthony] Amoroso and Weinberg; [Louis C.]
> Johanson and [Howard} Criden had both travelled to Kennedy Airport for the occasion,
> but were not present when the money was given by Amoroso to Myers. All four
> defendants shared in the $50,000, with Errichetti receiving $15,000, Myers $15,000 and
> Johanson and Criden $20,000, part of which they shared with their law partner, Ellis
> Cook, who testified at the trial as an immunized witness.

> The specific charges against the defendants were bribery (18 U.S.C. § 201(c)), criminal
> gratuity (18 U.S.C. § 201(g)), interstate travel for unlawful activity (18 U.S.C. § 1952),[14]
> and conspiracy (18 U.S.C. § 371). Myers was charged with direct violations of the first

---

[14] Myers once again finds himself before a United States District Court to be sentenced for
violating 18 U.S.C. § 1952 for another bribery scheme.

three offenses; the other defendants were charged with aiding and abetting Myers' commission of the offenses. 18 U.S.C. § 2.

Myers testified on his own behalf and attempted to convince the jury that when he appeared on the videotape and received the money in return for his promise to introduce a private bill to enable the sheik to enter and remain in this country, he was only "play acting."  He argued that he had no criminal intent under the federal statutes because he never intended ultimately to do the acts for which he was receiving the money. In other words, Myers' defense was essentially that although he was swindling the sheik, in no way was he compromising his congressional office. Resolution of that central fact question rested peculiarly within the jury's province. They had the opportunity to view Myers on the witness stand and to evaluate his conduct and statements before the TV cameras. In fact, the jury asked to review the key videotapes during their deliberations. Ultimately they resolved this credibility issue against Myers.

Under the court's instructions, the jury's verdicts of guilty against all defendants necessarily established the elements of the crimes charged.

On the bribery count, 18 U.S.C. § 201(c), the jury found that Myers received money from Amoroso in return for being influenced in his performance of an official act, and that he acted knowingly, wilfully and corruptly. The central issue presented to the jury was Myers' intent when he took the money. The jury's verdict determined that he took it with a specific intent to be influenced in connection with official matters relating to immigration, and that the other defendants aided and abetted him in his bribery.

Under the court's instructions the jury returned no verdict on the criminal gratuity count, 18 U.S.C. § 201(g), a lesser included offense of the bribery count (§ 201(c)), because they had found all defendants guilty of bribery.

 On the interstate travel count, 18 U.S.C. § 1952, the jury found that on August 22, 1979 Myers travelled in interstate commerce from Philadelphia to JFK airport in New York with intent to carry on the unlawful activity of receiving a bribe, that he thereafter performed an act either to carry on or promote the unlawful activity or to distribute its proceeds, and that he acted knowingly and wilfully. Again Errichetti, Criden and Johansen were found guilty as aiders and abetters.

On the conspiracy count, 18 U.S.C. § 371, the jury found that all four defendants conspired to defraud the United States of the faithful and honest service of Congressman Myers and to have him receive money as a bribe in connection with the immigration, residency and citizenship problems of the fictitious middle eastern businessmen.

Once the jury resolved the central credibility issue as to whether Myers was "play acting" before the cameras with no intent to have it affect his official conduct, the evidence against the defendants was overwhelming[.]

Id., 1212-1213.

Myers himself was no stranger to the authority and responsibility vested in a political leader.  To the contrary, most of Myers' adult life has been devoted to Philadelphia politics, both as a state and federal official elected in his own right as well as a sought-after political consultant following his release from federal prison.  PSR ¶¶ 40, 116-120.  His myriad crimes have only undermined public confidence in the electoral process and Philadelphia's locally run elections in particular.  He has betrayed the public and his friends and neighbors.  This Court should impose a sentence that reflects the seriousness of Myers willingness to purchase influence with an elected election official and undermine free and fair elections is multiple divisions in the city.

**C.     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**.

It is difficult to overstate the seriousness of Myers' crimes given the unique position of power and influence that Myers exercised as a former congressman and political player in South Philadelphia.  By his own account, Myers exercised tremendous influence in the political arena in and around Philadelphia.  *See* generally PSR ¶ 40.  By his conduct, Myers repeatedly abused his position of influence and betrayed the voting public.  This Court should impose a sentence that reflects the seriousness of Myers' willful disregard of the nation's election laws.

**D.     The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports the imposition of a significant period of incarceration.  Congress provided for strong criminal sanctions as a general deterrent to election crimes.  Given the magnitude and brazenness of the conduct here, the interests of deterrence are best served by imposition of a substantial term of imprisonment within the Guidelines range.

Moreover, in light of the fact that many individuals who commit election crimes are, like the defendant, well-respected within their communities, the prospect of a non-custodial or fine-based punishment is hardly an adequate deterrent.  Influential individuals with access to the levers of power in government are unlikely to be deterred from conduct like Myers' if the only consequence imposed is a minimal sentence and a financial penalty.

Myers' years-long pattern of deception, and his attempts to minimize, distort, or outright hide his conduct from the FBI and the voting public make it evident that a lengthy custodial sentence is necessary to deter him and others from future criminal misconduct in the future. Generally, such characteristics suggest that a defendant is ordinarily unlikely to re-offend in the future.  But, where, as here, the nature, multitude, and temporal span of criminal behavior betray a man whose outlook on life was often to cheat – an outlook that succeeded for some time – his professional history and criminal history category are not mitigating factors.  On the contrary, Myers' experience, influence, resources, and power should weigh in favor of holding him to a more exacting standard.

For much the same reasons, the downward variance that Myers is seeking would send precisely the wrong message to the public.  General deterrence is a significant factor.  Election crimes, because they are committed in secret and hidden from view, are difficult to identify and prosecute.  Nonetheless, corruption of free and fair elections has tremendous social costs, as it erodes faith in democracy and perpetuates political corruption.  Effective deterrence of such offenses requires imprisonment that signals to the other individuals that they cannot avoid responsibility for the serious crimes proven before this Court.  Where the incidence of prosecution is lower because of the difficulty of detection, the level of punishment must be higher to obtain the same level of deterrence. *See generally*, Louis Kaplow and Steven Shavell,

"Fairness Versus Welfare," 114 Harv. L.Rev. 961, 1225-1303 (2001); *see also United States v. Hassebrock*, 663 F.3d 9096, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence of a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").  Indeed, in light of the public interest in this case, the Court's sentence may indeed have a cognizable impact on deterring future candidates and their political "fixers," all of whom are sure to be aware of the Court's sentence here, from committing future violations of the election laws.

**E.    The guidelines and policy statements issued by the Sentencing Commission and the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The government is aware of no training needs, vocational or otherwise, by Myers.  Nor is the government aware of any Guideline policy statements that call for a downward variance here based upon needs for educational or vocational training.  *See* PSR ¶¶ 114-115.  There is nothing alleged by Myers regarding his health that the Bureau of Prisons cannot adequately address.  *See* PSR ¶¶ 101-108.  He denies any need for treatment for alcohol or substance abused.  *See* PSR ¶¶ 111-113.

**F.    The need to avoid unwarranted sentence disparities.**

The most equitable way to ensure that the defendant's sentence is arrived at by a fair and objective calculation is by imposing a sentence within the guideline range.  While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.   Referring to the guidelines while carefully considering the § 3553(a) factors particularly relevant to an individual defendant is the only available means of preventing the

disfavored result of basing sentences on the luck of the draw in judicial assignments.  The Third

Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" §
> 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines."
> The section of Booker that makes the Guidelines advisory explains that "the remaining
> system, while not the system Congress enacted, nonetheless continue[s] to move
> sentencing in Congress' preferred direction, helping to avoid excessive sentencing
> disparities while maintaining flexibility sufficient to individualize sentences where
> necessary."  *Booker*, 543 U.S. at 264-65 (emphasis added).  The Guidelines remain at the
> center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court
> explained, the Sentencing Commission will continue "to promote uniformity in the
> sentencing process through the Guidelines.  *Id*. at 263.  We have likewise observed that
> the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime
> across the country.'"  *Coope*r, 437 F.3d at 331 (*quoting United States v. Mykytiuk*, 415
> F.3d 606, 608 (7th Cir. 2005)).

> *United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).  The best

way to avoid sentencing disparity in this case is to consider a sentence within the advisory

guideline range and then sentence Myers accordingly.  As the United States District Judge

observed when pronouncing sentence upon Jay Odom in the Middle District of Florida after his

guilty plea to or violating 18 U.S.C. § 1001:

> The offense … goes to the very heart of our democratic system. If we cannot have faith
> and confidence in our election process, then we can't exist as a democracy.

> So it is a direct attack on the very basics of our system and is difficult. I'm disappointed
> to understand -- not that you, but others in writing on your behalf talked about how they
> didn't think there was anything wrong with it, that everybody does it, it's just one of those
> things that's part of the system.

> Well, I hope and pray that that is not the case, but it's necessary, of course, that this be
> dealt with considering the seriousness of the offense as well as that misunderstanding on
> behalf of apparently so very many people that it is in fact just a mistake that's done all the
> time with no consequences as a result.

> Well, the consequences, I'm sure, cannot be necessarily identified in every case or
> defined, but clearly it violates the system that we all cherish and respond to.

*United States v. Odom*, 3:12-cr-00076, Sentencing Tr., 2-3 (N.D. Fla. April 23, 2013)(imposing a

term of six months imprisonment and a $46,000 fine upon a guilty plea to *one count* of causing

false statements to the FEC under Section 1001).  *See also* <u>*United States v. Bigica*</u>, 543 F. App'x 239 (3d Cir. 2013) (60 months imprisonment after guilty plea for tax evasion and conduit contribution conspiracy).

Therefore, in sum, all of the appropriate considerations of sentencing favor a sentence that includes a substantial period of incarceration within the recommended advisory range.  The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "These requirements mean that '[i]n the usual sentencing, … the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range."  *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences."  *Peugh*, 133 S. Ct. at 2084.  "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing."  *Id.*

## V.  <u>RESTITUTION</u>

The government is unaware of any restitution obligation on the part of the defendant.

## VI.  <u>GOVERNMENT'S RECOMMENDATION</u>

After considering the factors of 18 U.S.C. § 3553(a), the government recommends a sentence of imprisonment within the applicable sentencing Guidelines range.

Myers' crimes are an assault upon our democratic and electoral processes, and therefore warrant significant penalties.  Across the country, criminal violations of the election laws have resulted in significant penalties for the offenders for that very reason.  Accordingly, the serious nature of

Myers' criminal conduct warrants a significant sentence of incarceration within the applicable

guidelines range.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


 s/   *RICHARD P. BARRETT*
RICHARD P. BARRETT
Chief, Criminal Division
Assistant United States Attorney


s/ *ERIC L. GIBSON*
ERIC L. GIBSON
Deputy Chief, Corruption and Civil Rights
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Sentencing Memorandum has been served electronically on the

counsel of record:

Arnold Silverstein, Esquire
Noah Gorson, Esquire

*/s Eric L. Gibson*
ERIC L. GIBSON
Assistant United States Attorney

DATED:  September 22, 2022